ALFRED POST, for use, etc.

*v.*

THE UNION NATIONAL BANK OF CHICAGO *et al.*

*Filed at Ottawa January 20, 1896.*

1. APPEALS AND ERRORS—*final judgment in Appellate Court—presumption as to grounds of.* It will be presumed, on appeal from the Appellate to the Supreme Court, where no finding of fact is made by the Appellate Court differing from that of the trial court, that the action of the Appellate Court in rendering final judgment was based upon an assignment of error upon which it might properly refuse to remand, rather than upon one requiring remandment.

2. SAME—*final judgment of Appellate Court for want of evidence—when reversed on appeal.* A judgment of the Appellate Court reversing the judgment of the trial court and finally disposing of the cause, upon the assignment of error that a peremptory instruction for defendant was refused, must be reversed, on appeal, unless the plaintiff wholly failed to offer any competent evidence which tended to prove his right of recovery.

3. ACTION—*for surplus of note pledged as collateral—when it lies.* One entitled to the surplus of a note pledged as collateral for another note of less amount, is not bound to offer to pay the latter or demand a return of the former before bringing suit for such surplus, where the pledgee has received payment of the collateral note by taking another note in lieu thereof.

4. PAYMENT—*when payment of collateral note pays principal note.* A principal note is paid, as against a surety thereon, when the holder thereof receives payment of a larger note pledged as collateral security therefor, even though such payment be made by means of a third note taken by such holder in lieu of such collateral note.

5. PLEDGE—*effect of payment of pledged note by another note—rights of the parties.* A pledgee of a note as collateral security cannot receive another note in payment of the note so pledged, and subsequently, without the consent of the pledgor or his assignee, return the note received and take back the original note pledged, so as to re-instate the liability of the pledgor or deprive his assignee of the right to the surplus.

*Union Nat. Bank of Chicago* v. *Post,* 55 Ill. App. 369, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY V. FREEMAN, Judge, presiding.

Lewis H. Bisbee, and Thomas Cratty, for appellant:

The presumption must obtain in this court that the Appellate Court found the facts to be the same as the trial court found them. *Hayes* v. *Insurance Co.* 125 Ill. 626; *Siddall* v. *Jansen,* 143 id. 537; *Insurance Co.* v. *Scammon,* 123 id. 601.

The action of appellee in taking the note of the *Chicago Times* Company in place of the original collateral, and surrendering the latter to West, was an extension of the time of payment of the debt evidenced by it, and was in itself a conversion of the original collateral. Jones on Pledges, sec. 719; *Mexsen* v. *Lyell,* 5 Hill, 466; *Southwick* v. *Saxe,* 9 Wend. 122; Chitty on Bills, (ed. of 1839) 441; *Gage* v. *Punchard,* 6 Daly, 239; *Freeman* v. *Benedict,* 37 Conn. 559; *Key* v. *Fielding,* 32 Ark. 56; 3 Rand on Com. Paper, sec. 1821; Colebrook on Collaterals, sec. 95, p. 126; *Union Trust Co.* v. *Rigdon,* 93 Ill. 458.

In *Joliet Iron Co.* v. *Scioto Fire Brick Co.* 82 Ill. 549, it is held that the only right of the pledgee of commercial paper held as collateral security for the payment of a debt is to hold and collect the collateral when due and apply the proceeds to the payment of the debt, and pay the surplus, if any, to the pledgor. One obligation of the pledgee is to have the property pledged ready to deliver to the pledgor upon the payment of the debt, at the time when the debt becomes due. Failure of the pledgee to comply with this obligation excuses the pledgor from tendering payment, and amounts to a conversion of the pledge. *Cass* v. *Higenbotam,* 100 N. Y. 253.

Simeon P. Shope, (of counsel,) also for appellant.

Green, Robbins & Honore, for appellees:

The trial court erred in not directing a verdict in favor of the appellee the Union National Bank, and this error required a reversal as to all appellees. *Railroad Co.* v. *Nowicki,* 148 Ill. 29; *Jansen* v. *Varnum,* 89 id. 101; *Ragor*

v. *Kendall,* 70 id. 95; *Tetzner* v. *Naughton,* 12 Ill. App. 148; *Morrow* v. *Langan,* 16 id. 507; *Kimball* v. *Tanner,* 63 Ill. 519; *Earp* v. *Lee,* 71 id. 193; *McDonald* v. *Wilkie,* 13 id. 22; *Sheldon* v. *Quinlan,* 5 Hill, 441; *Claflin* v. *Dunne,* 129 Ill. 241; *Cochran* v. *Ammon,* 16 id. 316; *Blanchard* v. *Gregory,* 14 Ohio, 413; *Williams* v. *Chalfant,* 82 Ill. 218.

Where the evidence given at the trial, with all legitimate inferences that may legally and justifiably be drawn therefrom, is insufficient to support a verdict for the plaintiff, so that if such a verdict be returned it must be set aside, the court is not bound to submit the case to a jury, but may, and should in such case, direct a verdict for the defendant. *Simmons* v. *Railroad Co.* 110 Ill. 340; *Railroad Co.* v. *Adler,* 129 id. 335.

Appellant failed to prove the breach of duty of the appellee to return the collateral upon the payment of the debt, and for absence of proof upon this essential point the trial court should have instructed for the defendants. *Cass* v. *Higenbotam,* 100 N. Y. 248; *Donald* v. *Suckling,* L. R. 1 Q. B. 585; *Lewis* v. *Mott,* 36 N. Y. 395.

In *Talty* v. *Freedman's Savings and Trust Co.* 93 U. S. 321, replevin of a certificate of indebtedness brought by the pledgor against a purchaser from the pledgee, who bought *bona fide* and without notice of plaintiff's claim, it was held that a previous tender was necessary, and that an offer to pay was not equivalent to a tender. *Halliday* v. *Holgate,* L. R. 3 Exch. 299; *Hull* v. *Robinson,* 2 N. Y. 293.

The duty of the pledgee is limited to returning the collateral, unimpaired in value, when the debtor pays the debt. *Cumnock* v. *Newburyport,* 142 Mass. 342; *Hunter* v. *Moul,* 98 Pa. St. 13; *Insurance Co.* v. *Marr,* 46 id. 504; *Ward* v. *Bank,* L. R. 8 App. Cases, 755; *Joliet Iron Co.* v. *Brick Co.* 82 Ill. 548; Jones on Pledges, sec. 718; Colebrook on Collaterals, sec. 15; *Kelley* v. *Post,* 37 Ill. App. 396.

If the *Times* signature was purely for West's accommodation, and for this reason not binding on it, then the only effect was the transfer of the original obligation of

West from one piece of paper to another, which in no substantial way affected 'the obligation. *Reid* v. *Abernethy*, 77 Iowa, 438.

A promissory note made by the debtor does not discharge the preceding debt for which it was given, unless such be the agreement of the parties. 2 Daniel on Neg. Inst. secs. 1260, 1267; 1 Edwards on Bills, sec. 290; *Iron Co.* v. *Walker*, 76 N. Y. 526; *"The Kimball,"* 3 Wall. 37; *Jansen* v. *Grimshaw*, 125 Ill. 476; *Chisholm* v. *Williams*, 128 id. 116; *Bond* v. *Insurance Co.* 106 id. 654; *Savings Bank* v. *Bornman*, 124 id. 200; *Olcott* v. *Rathbone*, 5 Wend. 491; *Bank* v. *Good*, 21 W. Va. 455; 1 Smith's Lead. Cases, (7th Am. ed.) 613; *Tobey* v. *Barber*, 5 Johns. 68; *Muldoon* v. *Whitlock*, 1 Cow. 290; *Putnam* v. *Lewis*, 8 Johns. 389; *Johnson* v. *Weed*, 9 id. 310; *Stone and Gravel Co.* v. *Iron Co.* 124 Ill. 623; *Kraus* v. *Meyer*, 32 Iowa, 566.

The cases hold that the rule as to payment is no different even where a note of one person is given up and the new note of a different person received. *Bond* v. *Insurance Co.* 106 Ill. 654; *Tobey* v. *Barber*, 5 Johns. 68; *Stone and Gravel Co.* v. *Iron Co.* 124 Ill. 623; *Johnson* v. *Weed*, 9 Johns. 310.

Mr. JUSTICE WILKIN delivered the opinion of the court:

Alfred Post borrowed $16,000 of the Union National Bank of Chicago on February 12, 1889, for which he gave his promissory note of that date, payable in ninety days, with Francis A. Riddle as surety. He at the same time deposited with the bank, as collateral security, this note:

"$25,000.        CHICAGO, *September 14, 1888.*

"One year after date I promise to pay to the order of James E. Monroe $25,000, with interest at the rate of six per cent per annum, value received.

JAMES J. WEST,
Per F. S. W."

It was indorsed on the back, "Without recourse on me in any event.—James E. Monroe." This note was given

to Post by West for money borrowed of him.  J. J. P. Odell, vice-president of the bank, seems to have had personal charge of the transaction, and he, on the 16th day of March, delivered to West the $25,000 collateral note and took in exchange for it another, as follows:

"$25,750.                     CHICAGO, *March 16, 1889.*

"September 24, 1889, after date, we promise to pay to the order of James J. West $25,750, payable at *Times* office, Chicago.  Value received, six per cent interest.

CHICAGO TIMES COMPANY,
JAMES J. WEST."

This note had the name "James J. West" twice indorsed on the back.  On April 29 or 30 following, Riddle called on Odell and presented to him this paper:

"*Riddle*—It was understood between us that one-half of the $9000 still due on the J. J. West note was to be paid to you.  That amount you are hereby authorized to take, holding balance in trust for me, and when I can collect outstanding money you shall be paid more.

ALFRED POST."

About the 9th of July, 1889, Odell delivered back to West the last mentioned note and took another in lieu thereof by him individually, payable to his order and indorsed by him, for $25,000, dated back to September 14, 1888, payable one year after date, with interest at six per cent from date.  Still later, in the month of September, West returned the original $25,000 collateral note to Odell and received in exchange his own individual note last above described.  On the 16th of March, 1889, the $16,000 note given to the bank was assigned by Odell to David Kelly, a stockholder and director in the bank, and it is claimed by defendants that thereafter he was the owner thereof, and that Odell's transactions in connection therewith were as his agent, and not acting for and on behalf of the bank.  Plaintiff insists that the transfer to Kelly was merely colorable, and that the bank still

continued to be the real party in interest. In October, 1889, on a cross-bill against Post to reach the excess of the $25,000 note deposited as collateral security for the $16,000 loan, Riddle obtained a decree for $11,771.38 in the Superior Court of Cook county. About the third of March, 1890, Post agreed with Riddle that he should have the remainder of the said $25,000 note over and above the $16,000. This balance Riddle demanded of the bank, Kelly and Odell, which they each refused to pay, and this is an action to recover the same.

The declaration was filed in the Superior Court of Cook county on July 29, 1890, in trover, but afterwards amended so as to make the action trespass on the case. The first count of the declaration, being the one on which the right of recovery is based, sets up the borrowing of the $16,000 by Post, with Riddle as surety, the deposit of the $25,000 note of James J. West as collateral, and then avers that it became and was "the duty of said bank to safely keep the same, and to have the same ready to return to the plaintiff upon the payment by said plaintiff of the said note of said plaintiff and said Riddle, yet the said bank, and the said other defendants herein, well knowing the premises, contriving and intending, etc., on, to-wit, the first day of March, 1889, and before the maturity of said note of said plaintiff and said Riddle, and while said bank still held said note of said West of and for said plaintiff in pledge as collateral security, as aforesaid, did wrongfully take and surrender and deliver the said West note to the said West, and did convert and dispose of the same to their own use, whereby the same became and is wholly lost to the said plaintiff, and plaintiff has been and is greatly injured," etc. Other counts in the declaration set up the exchange of notes by Odell with West, and charge the defendants with neglect of duty and consequent loss to the plaintiff in failing to safely keep the notes received in exchange. The damages are laid at $15,000.

The plea was "not guilty," and a trial by jury resulted in a verdict for plaintiff for $12,500. On appeal by defendants the Appellate Court, on November 12, 1894, reversed the judgment below and remanded the cause to the Superior Court for another trial. The plaintiff below filed his petition for a rehearing, which was on December 20 denied. On January 15, 1895, on his motion, it was ordered that the judgment of November 12 be set aside and vacated, and another judgment was entered, reciting: "And the court now here, having diligently examined and inspected as well the record and proceedings aforesaid as the matters and things therein assigned for error, and being now sufficiently advised of and concerning the premises, holds, as a matter of law, upon the facts shown in the record herein, that the appellee cannot recover, and that in the record and proceedings aforesaid, and in the rendition of the judgment aforesaid of the said Superior Court of Cook county, there is manifest error; therefore it is considered by the court that the said judgment of the Superior Court of Cook county be reversed, annulled, set aside and wholly for nothing esteemed." On the same day this appeal was allowed and the bond filed and approved. On the 17th defendants below entered their motion to set aside the judgment of the 15th and re-instate the one of November 12 reversing and remanding the cause, and in case that motion was not granted, that the judgment be corrected so as to show that it was entered against their objection; that there be inserted therein a proper finding of facts, in accordance with the opinion filed; that it be amended so that the words "facts shown in the record herein" shall read, "the facts shown in the evidence in said cause," and that it be amended so as to correctly show that the motion of appellee referred to in said order was a motion to strike out the remanding part of said order. On the 21st, in passing upon this motion, the court again ordered that the judgment of January 15, 1895, be amended, as follows: "That the

judgment entered by this court in said cause on the 12th day of November, 1894, * * * be and the same is hereby set aside and vacated,—to all of which said appellants object and except; and the court now here, having diligently examined and inspected * * * and being now sufficiently advised of and concerning the premises, holds, as a matter of law, upon the facts shown in the evidence herein, that the appellee cannot recover, and that in the record and proceedings aforesaid, and in the rendition of the judgment aforesaid, * * * there is manifest error," etc.

It will thus be seen that, notwithstanding the judgment appealed from is a final determination of the cause in the Appellate Court, there is no recital therein of the facts as found by that court. The first question therefore to be disposed of is, does the record present a case for review in this court, and if it does, upon what basis must we consider the case?

Section 87 of the Practice act (Laws of 1877, p. 153,) provides: "If any final determination of any cause, as specified in the preceding sections, shall be made by the Appellate Court, as the result, wholly or in part, of the finding of the facts concerning the matter in controversy different from the finding of the court from which such cause was brought by appeal or writ of error, it shall be the duty of such Appellate Court to recite in its final order, judgment or decree the facts as found, and the judgment of the Appellate Court shall be final and conclusive as to all matters of fact in controversy in such case." There being no recital of the facts in this judgment, in the absence of anything in the record to show otherwise, it would be presumed that the final determination of the cause was not the result, either wholly or in part, of finding the facts to be different from those found by the court below. If, however, upon looking into the record it does appear that the evidence upon the material issues in the case is conflicting, it would seem to neces-

sarily follow that the reversal of the judgment below and final determination of the case were the result of finding the facts otherwise than as found by the trial court.

In determining whether the Appellate Court found the facts to be different from those found by the trial court, it will be proper first to notice the errors assigned by the appellants in that court. They were, in substance, that the trial court erred in admitting and excluding testimony; that it erred in giving, modifying and refusing instructions; that it erred in refusing to instruct the jury, upon the request of the defendants, to return its verdict in their (defendants') favor.

Manifestly the reversal was not upon the alleged errors in receiving or excluding evidence, or the giving, modifying or refusing instructions, because in that case it would have been the duty of the court to remand the cause to the court below for another trial. That the remanding order was stricken out at the instance of appellant, Post, signifies nothing, because, presumably, that request was made and allowed upon the supposition that the reversal was not on account of mere irregularities occurring upon the trial,—that is to say, if the court had based its judgment upon those errors which could be corrected upon another trial, it would not, at the request of the plaintiff below, have consented to strike out the order remanding the cause.

The last assignment of errors above referred to,—that is, that the court erred in refusing to instruct the jury to find for the defendants,—under many recent decisions of this court raised a question of law,—that is to say, whether there is any evidence fairly tending to prove a material and necessary allegation in plaintiff's cause of action is a legal question, and is reviewable, as such, in this court. We have, then, two classes of errors assigned upon the record as filed in the Appellate Court: First, those which go merely to the regularity of the proceedings in the trial court; and second, the one questioning plaintiff's right

of recovery, as a matter of law, for want of any com-
petent testimony fairly tending to support it. Having
already determined that the final judgment was not
based on the former of these errors, necessarily it must
have been upon the latter. In other words, there being
an assignment of error upon which the Appellate Court,
if it sustained the same, might properly refuse to remand
the cause for another trial, we will presume that its ac-
tion was based upon that alleged error, rather than those
which, if sustained, would have required a remandment
of the cause. It would seem to necessarily follow that
the judgment appealed from was not the result of finding
the facts to be different from those found by the trial
court. No question is raised by that assignment of error
as to the facts deducible from conflicting evidence, but
the naked question is, is there any evidence tending to
support the cause of action. We think it also affirma-
tively appears from the record that the judgment was
not the result of such finding of the facts. The court not
only failed to certify the facts, as would have been its
duty had it found them to be different from those found
by the court below, but it refused to allow appellees'
motion asking it to make such certificate. Unless, there-
fore, we can say, from the testimony presented by the
bill of exceptions in this record, that the plaintiff wholly
failed to offer any competent evidence whatever, which,
with all its legal inferences and intendments, tended to
prove his right of recovery, the judgment of the Appel-
late Court must be reversed. If there is such evidence,
no matter how strongly it may be controverted by other
testimony, the legal question (as stated above) must be
resolved in favor of the plaintiff. In fact, counsel for
appellees, as we understand them, base their argument in
support of the correctness of the decision of the Appel-
late Court on the ground that the plaintiff wholly failed
to make out his case by proof. They contend there is no
evidence tending to prove that plaintiff offered to pay the

$16,000 debt or made any demand for the collateral before bringing this action, and that proof, they insist, was essential to his right of recovery; also that, in the language of the Appellate Court, "human ingenuity cannot explain how any injury could have resulted to anybody by the exchange between Odell and West."

. The theory of plaintiff's case is, that by taking the *Times* Company-West note in exchange for the collateral note, payable to plaintiff, the latter note was paid off, and out of its proceeds the $16,000 note was satisfied, leaving a balance in the hands of Kelly, or the bank, which belonged to plaintiff.   If there is evidence tending to support that theory, we are unable to see upon what just or legal line of reasoning it can be held that he is not entitled to a recovery.   Certainly to have offered to pay the $16,000 debt, or to demand a return of the $25,000 collateral note payable to plaintiff, would have been an abandonment of that ground upon which a right of recovery is predicated.   That there is testimony tending to support plaintiff's contention certainly cannot be seriously questioned.   Riddle testified:   "On April 29 or 30 I went to the Union National Bank and there saw Odell in his private office.   I told him that I had received an assignment from Post of the surplus of the $25,000 note which had been made by James J. West and deposited by Post as collateral security to Post's note for $16,000. I then and there showed Odell the assignment I had received from Post, and Odell heard it, and I read it to him there."   He then identifies a letter, being the same set out in the foregoing statement of facts in which it is stated "it was understood between us," etc., signed "Alfred Post."   He further says: "I showed that letter and that assignment to Odell, I think, on the 29th of April, 1889, although it may have been the 30th.   Odell heard it, and then said to me: 'Your note is paid, West's note is paid; you don't owe the bank any money, Post don't owe the bank any money.'   I then said to Odell,

'What do you mean?' Odell replied to my question that West was a friend of his; that he was a bright young man, was president of the *Chicago Times* newspaper and its principal proprietor and editor; that he (West) was being pursued by a number of other newspaper people and some policeman or detective; that West was very anxious to take up the $25,000 note which Post had left with the Union National Bank as collateral security to the loan of $16,000; that West took up that $25,000 note which had been left as collateral to the loan of $16,000, and paid for it by giving therefor a note of the *Chicago Times* Company, which *Chicago Times* Company note was guaranteed by James J. West.     *     *     *     I then told Odell that it was true that neither Post nor myself owed the bank any money, and that West, having paid his note for $25,000 to the bank, the bank was liable to pay over to me, upon the assignment from Post, the difference of $9000 between the $16,000 note and the $25,000 collateral note, together with interest from September 14, 1888, to the 29th of April, 1889.    I then told Mr. Odell that I wanted the balance that was due.    Odell then said he was not certain whether he ought to pay me or not.    I then said to Odell, 'Here is my assignment, and Post owes me much more than this, and I don't want any doubt about it,' to which Odell replied, 'I don't know whether I ought to pay it or not; but I wanted to accommodate West and so I surrendered him the note, and if the bank is responsible I am to blame for it.'    That was about the substance of the conversation between Odell and myself at that time,"—April 29 or 30, 1889.

For the purpose of this decision it might be conceded that this testimony is squarely contradicted by Odell and that it is uncorroborated by that of other witnesses, though we do not think that can be fairly said when all the evidence is considered.    It certainly will not be seriously contended that it does not tend to prove the payment of the $25,000 collateral note.    It is conceded, of

course, that the taking of one note for another is not a payment of the other, unless so treated and understood by the parties at the time. But here is the positive testimony of Riddle that Odell, the representative of the legal owner of the $16,000 note, who transacted the business in exchanging one note for the other, admitted that the $25,000 collateral note was paid by the taking of the *Times* Company note. If that was true it was an absolute payment of the first note,—as much so as if money had been delivered to Odell instead of the *Times* Company note. Certainly what was done subsequently between Odell and West in exchanging the *Times* Company note for West's individual note, and finally that note for the original $25,000 note, without the knowledge or consent of Post or Riddle, would make no difference. That is to say, Odell could not receive another note or money in payment of the $25,000 note, and subsequently, without the consent of the owner, treat that payment as not made. When the collateral $25,000 note was paid and surrendered to the maker, Post became entitled to the difference between its value and the $16,000 debt, and that right could not be defeated by attempting to undo the transactions out of which payment was received. His right of recovery was complete when the payment was made, and the measure of his damages was the value of his note. Suppose the payment had been made in money, and Post, either directly or through Riddle, had been informed of that fact; would it be claimed that the bank could escape liability by returning the money to West and receiving back the note? Would there be any doubt, in that case, that the legal damages sustained by Post would be the value of the collateral note less his debt? It seems to us not. That there is evidence in the record tending to prove that, notwithstanding the assignment of the $16,000 note to Kelly, the bank continued to be the real owner thereof, cannot be seriously questioned. The testimony certainly *tends* to prove that it was transferred

to Kelly only for the purpose of relieving the bank of what Odell thought would be an embarrassment if it should be known that it held Post's paper.

We do not think it necessary to enter upon an extended review of the evidence in the case. When it is all considered it seems to us clear that it cannot be justly said that it wholly fails to support the finding of the jury and judgment of the Superior Court.

The judgment of the Appellate Court must therefore be held erroneous. It will accordingly be reversed, and the cause will be remanded to that court with directions to pass on the other errors assigned upon the record in that court, and either affirm the judgment of the Superior Court or reverse and remand the cause to that court for another trial. 

*Reversed and remanded.*